1  THOMAS M. BOEHM [SBN 63888]
   LAW OFFICE OF THOMAS M. BOEHM
2  2 North Santa Cruz Avenue, Suite 211
   Los Gatos, CA 95030-5900
3
   TELEPHONE:       408.998.8899
4  FACSIMILE:       408.998.4848
   EMAIL:           BOEHMTM@GMAIL.COM
5
   ATTORNEY FOR PLAINTIFFS,
6  BERNARD PICOT and PAUL DAVID MANOS
   MTN TO DISMISS.OPPO.PDM.MAY 8 2010.FINAL.wpd
7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        SAN JOSE DIVISION

11
   BERNARD PICOT and          )     CASE NO.  5:12-CV-01939 EJD
12 PAUL DAVID MANOS,          )
                              )
13      Plaintiffs,           )
                              )
14 v.                         )     DECLARATION OF
                              )     PAUL DAVID MANOS
15 DEAN D. WESTON, and DOES 1 )     IN OPPOSITION TO MOTIONS TO
   through 15, inclusive,     )     DISMISS FOR LACK OF JURISDICTION
16                            )     AND VENUE AND TO TRANSFER
        Defendants.           )
17                            )     Hearing date:   August 10, 2012
   _____  )     Hearing time:   9:00 am
18                                  Dept:           Courtroom 4, 5th Floor
                                    Judge:          Hon. Edward J. Davila
19

20

21
        I, PAUL DAVID MANOS, declare as follows:
22

23
     I      I am an adult natural person and, since 2005, have been a resident of the State
24
     of Nevada.
25

26  _____

2    I make this Declaration in opposition to the motions pending before this Court brought by DEAN WESTON ["WESTON"] to dismiss the action for lack of personal jurisdiction and venue and to transfer this case to the Eastern District of Michigan.

3    In March 2009, BERNARD PICOT ["PICOT"], a longtime resident of California, contacted me in Nevada, where I resided, to assist and evaluate a hydrogen based technology then being promoted by Carey Hilton in Texas [the "HILTON TECHNOLOGY"].  PICOT directed all of his efforts in this regard from California.  I acted as an independent technological assessor. PICOT and I agreed that if success was achieved, I would join a yet-to-be-created structure as an owner.  I was expected to put my skills into practice to assess and further develop the HILTON TECHNOLOGY,  while PICOT would, primarily, tend to the business issues.

4    By March 2009, I had long experience with electrodeposition and water related technologies.

5    In pursuit of PICOT'S request and based on my resulting agreement with him, I asked WESTON, who I knew by then, to travel to Texas to inspect the HILTON TECHNOLOGY.  I paid WESTON'S travel expenses to do so.

6    At the time of this contact, WESTON acknowledged to me that he knew I lived in Nevada.

//

7    WESTON'S findings were of little or no value as he had merely watched the units as they were driven around on cars.  To probe deeper, I had prototypes of the HILTON TECHNOLOGY sent to me in Nevada, where I tested them.  By the Fall of 2009, I determined that the HILTON TECHNOLOGY was unworkable.

8    After his trip to Texas to observe the HILTON TECHNOLOGY, I was aware from his comments to me that WESTON returned to Michigan and became engaged there in an extensive effort to validate the HILTON TECHNOLOGY for the purpose of obtaining a license for it.  WESTON told me he was working with his business associate, Frank Joseph, toward this end and expected to present the HILTON TECHNOLOGY to his contacts in the automotive industry.

9    In July 2009, I went to Michigan with Carey Hilton for a test of the HILTON TECHNOLOGY that WESTON and Frank Joseph had arranged and were paying for at Roush testing facilities.

10    WESTON acknowledged to me that he knew PICOT lived in California.

11    Because the HILTON TECHNOLOGY had been brought to WESTON'S attention as a result of PICOT'S efforts, I advised PICOT of WESTON'S extensive activities in trying to validate the HILTON TECHNOLOGY during that time.  I am aware that, as a result, on July 19, 2009 PICOT sent a proposed agreement to define the relationships regarding the HILTON TECHNOLOGY, but WESTON never signed it.

12    After my determination that the HILTON TECHNOLOGY was unworkable, I began from scratch to search for a new approach to hydrogen fuel cells.

13    I achieved no significant progress as a result of this effort until December 2009, when I achieved a "breakthrough" which involved a formula for an electrolyte essential to the operation of the hydrogen process.  The breakthrough was not known to me before that point and certainly not in August 2009.  Even when I achieved the breakthrough, I was uncertain of my findings.

14    To confirm and, hopefully, advance my efforts, I conferred with Dr. Pravansu Mohanty at the University of Michigan in January or February 2010.  With the information obtained from Dr. Mohanty, I was able to progress further.

15    From my determination that the HILTON TECHNOLOGY was unworkable through the time I first conferred with Dr. Mohanty, I kept my research, progress, and results on this project to myself, except to the extent I revealed those things to Dr. Mohanty, who first signed a non-disclosure agreement.  To this day, I have not even shared the specifics of those results with PICOT.

16    Further significant development of the hydrogen cells and electrolyte fell to Dr. Mohanty beginning in approximately the first quarter of 2010 and, at his specific request, meetings between us were held outside the presence of WESTON.

17    I know from his statements to me that, during August through December 2009,

1      WESTON was pursuing business activities, including:

2      17.1      His and Frank Joseph's business, known as The Right Angle, which

3                was engaged in, among other things, the testing and development

4                of the HILTON TECHNOLOGY in order to present it to major

5                automotive industry buyers known to WESTON; and,

6      17.2      Engineering Interests, Inc., which he mentions in his Declaration

7                in support of his motions.

8

9   18   The project I was engaged on, if successful, had potentially wide-ranging

10       applications, including in the automotive industry.  After I determined that the

11       HILTON TECHNOLOGY was unworkable:

12      18.1      WESTON told me he and Joseph wanted to take advantage of their

13                contacts in the automotive industry, such as General Motors and

14                Chrysler, by obtaining a license to be held in the name of The Right

15                Angle, to sell the units I was developing to their contacts (if I was

16                successful);

17      18.2      WESTON asked that, on behalf of The Right Angle, he and/or

18                Joseph be permitted to interest these entities by demonstrating a

19                prototype of the unit in its then present state; and,

20      18.3      As part of these discussions, WESTON expressed to me his

21                willingness to assist me in my work so as to benefit himself and

22                Joseph via The Right Angle.

23

24   19   As of result of the foregoing discussions:

25      19.1      WESTON became involved in the procurement and delivery of

26   _____

27   DECLARATION OF PAUL DAVID MANOS
     IN OPPOSITION TO MOTIONS TO DISMISS

28   FOR LACK OF JURISDICTION AND VENUE AND TO TRANSFER. . . . . . . . . . . . . . . . . . . .   Page 5 of 16 pages.

1                               parts, the assembly, and testing of prototypes;

2          19.2        WESTON'S vehicles were used for the demonstrations in

3                        Michigan, all of which were to prospects he and/or Joseph had

4                        introduced; and,

5          19.3        WESTON and/or Joseph attempted to interest their contacts by

6                        providing them with demonstrations and testing opportunities,

7                        sometimes without my direct participation, but none of their

8                        prospects ever purchased or licensed anything.

9

10    20       Based on my prior acquaintance with WESTON, I did not view him as skilled

11             as a researcher but, nonetheless, believed he could be of assistance to me in my

12             effort to test the new approach I had begun working on.  I realized that

13             WESTON'S role would have to be limited to assembly and testing.  And, even

14             as to his limited role, I directed WESTON on the tasks he was assigned and

15             WESTON was always subject to my general supervision.

16

17    21       Throughout WESTON'S involvement on this matter with me, I never engaged

18             him for or gave him permission to perform research involving the key elements

19             of the hydrogen process or the electrolyte.  Though I allowed WESTON to test

20             certain materials I had developed the formulas for, these materials were always

21             pre-mixed before being given to WESTON and were never identified to him.

22

23    22       I have never told or otherwise purposefully revealed to WESTON the formula

24             for the electrolyte and WESTON has never told me that he knows it.

25   //

26

23    By late 2009, WESTON was generally aware that I had been progressing in my work and that I referred to the hydrogen cells and proprietary fluids I had developed as "Hydrostein."

24    In about November 2009, WESTON told me that, through The Right Angle, he wanted to purchase a large number of units and corresponding electrolyte fluid once I had solved the remaining issues I was facing.  He said he and Joseph wanted these for resale to their contacts in the automotive industry.  Accordingly, I informed PICOT and an invoice was created and sent to WESTON by PICOT in early December 2009.  WESTON never objected to me about this designation, which I understood to be correct based on his comments to me.

25    WESTON'S business aspirations for The Right Angle suffered a setback later in December 2009, when Frank Joseph was convicted and sentenced on three counts of wire fraud, nine counts of interstate transportation of stolen money or property, and 24 counts of conducting monetary transactions in criminally derived property.

26    Thereafter, WESTON began requesting that he be utilized in some fashion by me on my work.

27    At my and PICOT'S request and at our expense, WESTON traveled to Southern California in about January 2010, where he stayed for approximately a week, to assist me in a demonstration to Peter Warkentin, who lived in that area and had

1    been procured by PICOT from California as a potential purchaser or licensee.

2    The demonstration was also attended by PICOT, me and Peter Mueller, a

3    California resident, who worked for Brabus USA of Irvine, California, and

4    independently tested the prototype at the invitation of Messrs. Warkentin and

5    Reeder as part of the demonstration.

6

7    28    Warkentin was favorably impressed by the demonstration in Southern California

8    and asked that another demonstration be conducted in Mexico for a prospect

9    of his there.   Warkentin agreed to pay for the travel expenses for the

10    demonstration in Mexico, so PICOT and I consented and I asked WESTON to

11    travel to Mexico to conduct the requested demonstration there pursuant to

12    Warkentin's request.   WESTON did so and was paid by or at the direction of

13    Warkentin.

14

15    29    In the last months of 2009, WESTON had begun to repeatedly ask me to share

16    the results of my research with him.   I always refused.

17

18    30    WESTON'S persistent attempts to learn the formula from me made me

19    increasingly distrustful of him.   So, I asked WESTON to sign a non-disclosure

20    agreement [the "NDA"], which WESTON did on February 1, 2010.   A true

21    copy of the NDA is attached as EXHIBIT "A."

22

23    31    As a result of his ongoing efforts in and from California, PICOT had procured

24    ADP HOLDINGS, LTD., a California corporation based near Sacramento

25    ["ADP"].   In May 2010, ADP proposed a joint venture which would obtain a

26

27    **DECLARATION OF PAUL DAVID MANOS**
      **IN OPPOSITION TO MOTIONS TO DISMISS**

28    **FOR LACK OF JURISDICTION AND VENUE AND TO TRANSFER. . . . . . . . . . . . . . . . . . . .  Page 8 of 16 pages.**

1      license to exploit the hydrogen technology and wanted a demonstration.

2

3    32    In June 2010, again at PICOT'S and my request, WESTON traveled to the

4          Sacramento, California area to install prototypes on ADP'S vehicles for the

5          requested demonstration.

6

7    33    While WESTON was assisting me in the demonstration to ADP, ADP suggested

8          to me and PICOT that the joint venture it had proposed should create a

9          research, development, and marketing facility for the project in a building it had

10         already located near Sacramento.  PICOT and I each expressed an interest in

11         doing so.

12

13   34    And, having been within hearing of this discussion, WESTON told the principals

14         of ADP that he wanted to work at that California location for the joint venture.

15

16   35    WESTON's travel expenses for his trips to Texas for the inspection of the

17         HILTON TECHNOLOGY and his travel expenses for his trips to California for

18         the Warkentin and ADP presentations were paid by or at the direction of me

19         and/or PICOT.

20

21   36    From June 2010 through July 2011, WESTON was paid $42,500 by or at the

22         direction of PICOT and me in exchange for his work and any related expenses

23         he may have incurred.  For his time after December 2009 and prior to June

24         2010, I made additional payments to WESTON, but do not currently know the

25         exact amount.  I estimate the total of all payments to WESTON, including the

26

27   **DECLARATION OF PAUL DAVID MANOS**
     **IN OPPOSITION TO MOTIONS TO DISMISS**

28   **FOR LACK OF JURISDICTION AND VENUE AND TO TRANSFER. . . . . . . . . . . . . . . . . . . . . Page 9 of 16 pages.**

1    above mentioned $42,500, to be $50,000 or more, exclusive of payment for
2    his travel expenses.

3

4    37   WESTON was aware that ADP was advancing money based on its May 2010
5         commitment, but never claimed to me that he was entitled to any portion of that
6         money.

7

8    38   Because ADP did not complete its full funding commitment, Dan Heindrichs
9         and Darrell Smith, both residents of California and both principals of ADP, met
10        in San Jose, California on January 19, 2011 with me, PICOT, and Coats and
11        orally terminated ADP'S relationship.

12

13   39   In March 2011, I advanced $10,000 to ADP in California, which initially was
14        to have been a loan.  Thereafter, the amount was treated as a payment to ADP
15        for the termination.

16

17   40   In May and June 2011, Thomas M. Boehm, a California attorney, represented
18        me and PICOT in certain issues that arose then between us and ADP.

19

20   41   In April 2011, IBKE, an entity controlled by Tracy Coats and Carl Le Souef, a
21        resident of Australia, obtained an expanded license agreement for the cells and
22        fluid I had developed, enlarging the territory to the entire world.

23   42   WESTON knew that payments were being made under the IBKE license, but
24        never claimed to me that he was entitled to any portion of that money.

25   //

26

27   DECLARATION OF PAUL DAVID MANOS
     IN OPPOSITION TO MOTIONS TO DISMISS
28   FOR LACK OF JURISDICTION AND VENUE AND TO TRANSFER. . . . . . . . . . . . . . . . . . .  **Page 10 of 16 pages.**

43    I was also represented by Mr. Boehm in regard to the sale of the cells and fluid to an entity to be formed and controlled by Tracy Coats and Carl Le Souef.

44    In furtherance of these talks, in December 2011, I attended meetings with PICOT, Coats and Le Souef in Los Angeles.  Impasses in the discussion were mediated there by Joseph Dunn, a resident of Los Gatos, California.  PICOT, I and the principals of HMR signed the final version of the sales agreement in Los Angeles, California and it became effective December 12, 2011.

45    I have never told WESTON that:

    45.1    He was entitled to or would receive an ownership interest in my work or the hydrogen project I was engaged in under any circumstances;

    45.2    He was entitled to or would receive a share in or portion of the profits from the sale or license of the hydrogen project I was engaged in;

    45.3    He was entitled to or would receive $20,000 per month for his efforts in assisting me or for such expenses as he might incur in regard thereto; or,

    45.4    I had any authority to bind PICOT to any such commitment/s as set out above in this paragraph.

46    To my knowledge, PICOT was not in Michigan at all during 2009 and was there on only a very few occasions in 2010.  On those occasions when PICOT was in Michigan in 2010, PICOT'S interaction with WESTON was short, superficial,

1 and to my knowledge always in my presence.

2

3 47 I have never heard PICOT tell WESTON that:

4  47.1 WESTON was entitled to or would receive an ownership interest

5   in my work or the hydrogen project I was engaged in under any

6   circumstances;

7  47.2 WESTON was entitled to or would receive a share in or portion of

8   the profits from the sale or license of such matters; or,

9  47.3 WESTON was entitled to or would receive $20,000 per month for

10   his efforts in assisting me or for such expenses as he might incur in

11   regard thereto.

12

13 48 Prior to the initiation of this lawsuit, WESTON never informed me that PICOT:

14  48.1 Had promised him an ownership interest in my work or the

15   hydrogen project I was engaged in under any circumstances;

16  48.2 Had promised him a share in or portion of the profits from the sale

17   or license of such matters; or,

18  48.3 Had promised him $20,000 per month for his efforts in assisting

19   me or for such expenses as he might incur in regard thereto.

20

21 49 On February 8, 2012, WESTON sent me an email, a copy of which is attached

22  as EXHIBIT "B."  Portions of this email have been redacted to maintain the

23  attorney-client communication privilege otherwise violated were my comments

24  in forwarding the email revealed.  I informed PICOT of this email while he was

25  in California.

26

27 DECLARATION OF PAUL DAVID MANOS
IN OPPOSITION TO MOTIONS TO DISMISS

28 FOR LACK OF JURISDICTION AND VENUE AND TO TRANSFER. . . . . . . . . . . . . . . . . . .   **Page 12 of 16 pages.**

50      Shortly after sending the above email, WESTON called me on the phone, while I was in Nevada, and demanded $250,000 from me and PICOT right away or he would "do everything in his power to destroy" both PICOT and me.  I informed PICOT of this threat while he was in California.

51      Neither I nor PICOT paid WESTON any portion of this demanded amount.

52      On March 20, 2012, I received an email indicating that it originated from William Dobreff, who identified himself as a Michigan attorney for WESTON.  A copy of this email is attached as EXHIBIT "C."  Portions of this email have been redacted to maintain the attorney-client communication privilege otherwise violated were my comments in forwarding the email revealed.

53      Prior to March 20, 2012, WESTON had never mentioned that he was contemplating a suit against me or PICOT concerning the matters detailed above.

54      As a direct result of the actions by WESTON in asserting the oral agreement he insists I entered into with him and by his actions in asserting to HMR that I disclosed the formula for the electrolyte to him in August 2009:

    54.1      HMR has stopped payments under the CONTRACT, which were benefitting me in Nevada and PICOT in California; and,

    54.2      Attorney's fees have been incurred and paid in California to seek resolution of the matter with HMR and disprove that WESTON obtained the formula as he maintains or is entitled to a share of the

1        payments under the CONTRACT otherwise coming to me.

2

3    55    In addition to the parties to this action, the following individuals are expected

4        to provide evidence as indicated below:

5        <u>INDIVIDUAL</u>        <u>RESIDENCE</u>        <u>EXPECTED EVIDENCE</u>

6    55.1  Julia Blair        Nevada        Oral and documentary concerning:

7                            The creation, structure, ownership,

8                            administration, and dissolution of

9                            DBHS LLC, A Nevada LLC.

10   55.2  Nedra K. David     Nevada        Oral and documentary concerning:

11                           Payments to WESTON by and at the

12                           direction of MANOS and PICOT.

13   55.3  Tiffany Brunello   Nevada        Oral   concerning: WESTON'S

14                           telephonic threat to ruin MANOS

15                           and PICOT if they did not pay

16                           $250,000.

17   55.4  Robert L. Campbell California     Oral concerning: Consultations on

18                           the technology in early 2011 in

19                           California.

20   55.5  Joseph Dunn        California     Oral concerning: Role as mediator in

21                           contract  negotiations  between

22                           PICOT and MANOS, on the one

23                           hand, and Carl Le Souef and Tracy

24                           Coats, on the other hand, in Los

25                           Angeles.

26

27   **DECLARATION OF PAUL DAVID MANOS**
     **IN OPPOSITION TO MOTIONS TO DISMISS**
28   **FOR LACK OF JURISDICTION AND VENUE AND TO TRANSFER. . . . . . . . . . . . . . . . . . .   Page 14 of 16 pages.**

| | | | | |
|---|---|---|---|---|
| 1 | 55.6 | Dan Heinrich | California | Oral and documentary concerning: |
| 2 | | | | The California based negotiation for |
| 3 | | | | a proposed joint venture concerning |
| 4 | | | | the hydrogen process, the terms of |
| 5 | | | | that proposed joint venture, the |
| 6 | | | | location and substance and effect of |
| 7 | | | | the activities of ADP in raising and |
| 8 | | | | paying money in order to obtain a |
| 9 | | | | joint venture for the technology. |
| 10 | | | | Confirmation of ADP'S intention to |
| 11 | | | | open a research and marketing |
| 12 | | | | facility in California and WESTON'S |
| 13 | | | | role in demonstrations of the |
| 14 | | | | technology in California and his |
| 15 | | | | expressed willingness to work in |
| 16 | | | | California for the joint venture. |
| 17 | 55.7 | Darrel Smith | California | Oral and documentary concerning: |
| 18 | | | | Similar to that of Dan Heinrich. |
| 19 | 55.8 | Peter Warkentin | Germany | Oral and documentary concerning: |
| 20 | | | | The California based negotiation for |
| 21 | | | | a proposed commercialization of the |
| 22 | | | | technology through WArkentin's |
| 23 | | | | company and the terms of that effort; |
| 24 | | | | Confirmation of Warkentin's request |
| 25 | | | | to have another demonstration in |
| 26 | | | | |

27 **DECLARATION OF PAUL DAVID MANOS**
**IN OPPOSITION TO MOTIONS TO DISMISS**
28 **FOR LACK OF JURISDICTION AND VENUE AND TO TRANSFER.** . . . . . . . . . . . . . . . . . . . . **Page 15 of 16 pages.**

| | | | |
|---|---|---|---|
| | | | Mexico and his payment of WESTON'S travel expenses to do so. |
| 55.9 | Peter Mueller | California | Oral and documentary concerning: The demonstration and testing of the hydrogen prototype for Warkentin and WESTON'S role as assistant to MANOS for that purpose. |

I declare under penalty of perjury under the laws of the United States that the foregoing is true of my personal knowledge, that if called as a witness I could and would testify competently thereto, and that this declaration was executed at Stateline, Nevada on May 8, 2012.

PAUL DAVID MANOS

DECLARATION OF PAUL DAVID MANOS
IN OPPOSITION TO MOTIONS TO DISMISS
FOR LACK OF JURISDICTION AND VENUE AND TO TRANSFER. . . . . . . . . . . . . . . . . . . . **Page 16 of 16 pages.**

| | | | |
|---|---|---|---|
| | | | Mexico and his payment of WESTON'S travel expenses to do so. |
| 55.9 | Peter Mueller | California | Oral and documentary concerning: The demonstration and testing of the hydrogen prototype for Warkentin and WESTON'S role as assistant to MANOS for that purpose. |

I declare under penalty of perjury under the laws of the United States that the foregoing is true of my personal knowledge, that if called as a witness I could and would testify competently thereto, and that this declaration was executed at Stateline, Nevada on May 8, 2012.


PAUL DAVID MANOS

DECLARATION OF PAUL DAVID MANOS
IN OPPOSITION TO MOTIONS TO DISMISS
FOR LACK OF JURISDICTION AND VENUE AND TO TRANSFER. . . . . . . . . . . . . . . . . . . Page 16 of 16 pages.

<u>PICOT v WESTON</u>, 5:12-CV-01939 EJD

# EXHIBIT "A"

**to
DECLARATION OF PAUL DAVID MANOS
IN OPPOSITION TO MOTIONS
TO DISMISS FOR
LACK OF JURISDICTION AND VENUE
AND TO TRANSFER**



# MUTUAL NON DISCLOSURE AGREEMENT

This Mutual Nondisclosure Agreement ("*Agreement*") is entered into by and between DBHS LLC, a NEVADA Company with its principle place of business located at 107 Cypress Way Stateline NV 89449, (together with its subsidiaries and affiliates, "DBHS LLC*)*, and ___Dean David Weston_____ with its principal place of business located at 3594 Lakeshore Dr_____ (the "*Company*"), as of the date set forth above the parties' signatures (the "*Effective Date*").

## PRELIMINARY STATEMENT

DBHS LLC and the Company wish to exchange certain business and other information in the course of discussions regarding the potential strategic relationship between DBHS LLC and the Company (the "*Purpose*"). In consideration for the parties' discussions and any access that each of DBHS LLC and Company (each referred to as a "*Receiving Party*") has to the confidential and proprietary information of the other (each referred to as a "*Disclosing Party*"), each Receiving Party hereby agrees as follows:

## AGREEMENT

1. **Information Covered.** This Agreement shall apply to all information relating to the Disclosing Party's business, including, without limitation, computer programs, technical drawings, algorithms, names and expertise of employees and consultants, know-how, processes, ideas, inventions (whether patentable or not), schematics and other technical, business, financial, customer and product−

development plans, forecasts, strategies and information, to the extent previously, presently, or subsequently disclosed to the Receiving Party (the "*Proprietary Information*" of the Disclosing Party).  "Proprietary Information" includes information that is disclosed by the Disclosing Party to the Receiving Party or that is otherwise learned by the Receiving Party in the course of its discussions or business dealings with, or its physical, telephonic or electronic access to the premises of, the Disclosing Party, and that has been identified as being proprietary and/or confidential or that by the nature of the circumstances surrounding the disclosure or receipt ought to be treated as proprietary or confidential.  Notwithstanding the foregoing, and without granting any right or license, each Disclosing Party acknowledges and agrees that this agreement shall not apply to proprietary information that the Receiving Party can document through competent written evidence:

(i)     is or (through no improper action or inaction by the Receiving Party or any affiliate, agent, consultant or employee of the Receiving Party) becomes generally known to the public;

(ii)    was in its possession or known by it prior to receipt from the Disclosing Party; or

(iii)   was rightfully disclosed to it by a third party without restrictions.

2.      **The Receiving Party's Obligations.**  The Receiving Party agrees:

(i)     to hold the Disclosing Party's Proprietary Information in strict confidence as a fiduciary and to take all reasonable precautions to protect such Proprietary Information (including, without limitation, all precautions that the Receiving Party employs with respect to its most confidential materials);

(ii)    except as strictly and expressly permitted herein, not to divulge any such Proprietary Information or any information derived therefrom to any third person;

(iii)   not to make any use whatsoever at any time of such Proprietary Information except to evaluate the Proprietary Information internally and directly in connection with the Purpose;

(iv)    not to remove or export from the United States or reexport any such Proprietary Information or any direct product thereof, except in compliance with, and with all licenses and approvals required under applicable U.S. and foreign export laws and regulations, including, without limitation, those of the U.S. Department of Commerce; and

(v)    not reverse engineer any such Proprietary Information or, except as strictly and expressly permitted herein, copy the same.

The Receiving Party may make disclosures required by court order *provided that* Receiving Party uses best efforts to limit disclosure and to obtain confidential treatment or a protective order and has promptly notified the Disclosing Party in writing (which notice must include, without limitation, a copy of the order and identification of the information to be so disclosed) and allowed the Disclosing Party to participate in the proceeding.   The Receiving Party will restrict the possession, knowledge and use of the Proprietary Information of the Disclosing Party to its employees, consultants, lawyers and entities controlled by or controlling it (collectively, "Personnel") that have a legitimate "need to know" such Proprietary Information in connection with the Purpose.  The Receiving Party will ensure that its Personnel comply with this Agreement and Receiving Party will be liable for any breach of this Agreement by its Personnel and will promptly notify the Disclosing Party of any such breach.

3.    Return of Proprietary Information.  Immediately upon (i) the decision by either party not to enter into the strategic relationship comprising the Purpose, or (ii) a request by the Disclosing Party at any time (which will be effective if actually received or three days after it is mailed by registered or certified U.S. mail, postage prepaid and return receipt requested, to the Receiving Party's address herein), the Receiving Party will turn over to the Disclosing Party all Proprietary Information of the Disclosing Party and all documents or media containing any such Proprietary Information and any and all copies or extracts thereof; provided that Disclosing Party shall, upon the written request from Receiving Party, provide the Receiving Party with a copy of any such Proprietary Information that is the subject of a claim or action by a court of competent jurisdiction, in order to assist such Receiving Party with regard to such claim or action, provided that the Receiving Party shall remain subject to its obligations under this Agreement, including without limitation its obligation to maintain the confidentiality of such Proprietary Information.

4. **No Required Disclosure or Transaction.** The Receiving Party understands that nothing herein (i) requires the disclosure of any Proprietary Information of the Disclosing Party, which shall be disclosed, if at all, solely at the option of the Disclosing Party (in particular, but without limitation, any disclosure is subject to compliance with export control laws and regulations), or (ii) requires the Disclosing Party to proceed with any proposed transaction or relationship in connection with which Proprietary Information may be disclosed. All Proprietary Information will remain the exclusive property of the Disclosing Party, and the Receiving Party will have no rights, by license or otherwise, to use the Proprietary Information except as expressly provided herein.

5. **Confidentiality of Agreement and Purpose.** Except to the extent required by law, neither party shall disclose the Purpose, the existence or subject matter of the negotiations with respect to the Purpose, or this Agreement without the prior written consent of the other party.

6. **Confidentiality Period.** This Agreement is intended to cover Proprietary Information disclosed or received by either party prior or subsequent to the Effective Date of this Agreement. Unless otherwise earlier terminated, this Agreement will automatically expire three (3) years from the Effective Date; provided that each party's obligations hereunder with respect to the other party's Proprietary Information disclosed or received prior to termination or expiration will survive for two (2) additional years following the expiration or termination of this Agreement.

7. **Remedies.** The Receiving Party acknowledges and agrees that, due to the unique nature of the Disclosing Party's Proprietary Information, there can be no adequate remedy at law for any breach of its obligations hereunder, that any such breach may allow the Receiving Party or third parties to unfairly compete with the Disclosing Party resulting in irreparable harm to the Disclosing Party, and therefore, that upon any such breach or any threat thereof, the Disclosing Party shall be entitled to injunctive or other appropriate equitable relief, without the posting of a bond, in addition to whatever remedies it might have at law and to be indemnified by the Receiving Party from any loss or harm, including, without limitation, attorneys' fees, in connection with any breach or enforcement of the Receiving Party's obligations hereunder or the unauthorized use or release of any such Proprietary Information. The Receiving Party will notify the Disclosing Party in writing immediately upon the occurrence of any such unauthorized release or other breach of which it is aware.

8.      Severability.  If any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid, or unenforceable, such provisions shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

9.      Governing Law; Jurisdiction  This Agreement shall be governed by, and construed in accordance with, the laws of the State of NEVADA without regard to the conflicts of law provisions thereof.  DBHS LLC and the Company agree that all actions or proceedings related to this Agreement shall be litigated in the local, state, and federal courts located in the State of NEVADA.  DBHS LLC and the Company also each consent and submit to the jurisdiction of any local, state or federal court located within said county and state and consent to delivery and service of process by the means established in Section 10 below.

10.     Notices.  All notices required or desired to be given hereunder shall be deemed delivered when given by hand delivery, by nationally–recognized overnight courier service with tracking capabilities, or by registered or certified mail, return receipt requested, to the addresses set forth in the preamble to this Agreement, or such other addresses of which the parties may notify each other from time to time in accordance with this Section 10, and shall be effective upon receipt.

11.     Successors and Assigns.  This Agreement shall be binding on the parties and their successors and assigns, *provided that* the Receiving Party shall not assign any of its rights or obligations hereunder to any other party without the prior written consent of the Disclosing Party, but no such assignment shall relieve the assigning party of its obligations hereunder.   Notwithstanding the foregoing, DBHS LLC may assign this Agreement without the prior consent of the Company to an entity in connection with a merger, acquisition, reorganization or public offering of its securities.

12.     Legal Costs.  The prevailing party in any action to enforce this Agreement shall be entitled to its out–of–pocket and court costs and reasonable attorneys' fees.

13.   **Entire Agreement; Waiver.** This Agreement supersedes all prior discussions and writings and constitutes the entire agreement between the parties with respect to the subject matter hereof.  No waiver or modification of this Agreement will be binding upon either party unless made in writing and signed by a duly authorized representative of such party and no failure or delay in enforcing any right shall be deemed a waiver of such right.

In witness whereof, the parties have executed this Agreement as of the day and year set forth below.

Date ____ 2-1 - 10 _____

**DBHS LLC**

By ___[signature]_____   By ___[signature]_____

Its_____   Its____ Self _____

Print Name                          Print Name

___Paul D. Manos_____        ___Dean D. Weston_____

<u>PICOT v WESTON</u>, 5:12-CV-01939 EJD

# EXHIBIT "B"

**to**
**DECLARATION OF PAUL DAVID MANOS**
**IN OPPOSITION TO MOTIONS**
**TO DISMISS FOR**
**LACK OF JURISDICTION AND VENUE**
**AND TO TRANSFER**



From: "Dean Weston" <deandavidweston@yahoo.com>
Date: Feb 8, 2012 5:35 AM
Subject: Fw:
To: "Dave Manos" <dmanos55@gmail.com>

Dave, I sent this to you as a partner in DBHS after our phone call. Did you forward it on to Bernard like you said you were going to? I know I was never formally given stock or a contract but that was due to you saying it was extremely important that I stay low in this deal as it is moving forward fast and it would just slow down the process. In our last conversation you mentioned we may not be getting the 20 million dollars we were hoping for but we all may have to settle for a little less. Well I have basically lost everything due to this project and your promises to get me whole immediately. I have done a lot of research lately and understand that DBHS has received a lot of money and I am very surprised I have not received my fair share. Dave, I started this project with you, put a lot of my money and time into this project and deserve better. When the project started it was you , me and Bernard split 3 ways and only us. I spoke to you about dropping mine to 20% because you needed to show more stock available for someone else. I agreed to that as I am a team player. I am agreeable with anything you put together at this point, even if its on just the 2.55 million you received from the Australians, but I need some answers by this Friday, Feb 10th. I am sure we both agree that we don't need to take this any further as it will just tie things up for a very long time. I am willing to just get out now with making me whole. Dave, I know how you like to wait on things but I need this done immediately or I am in big trouble to pay back people I borrowed from for our project.


I know you said that you and Bernard are fighting and Bernard is forcing you to take my share out of yours but we can fight him on that as you were the managing member of DBHS when this all occurred. I am sure there are several things out there that Bernard would not like public and would help the cause if he knew all the facts.


Dave, I have done my homework on everything and know everything so lets just cut a fair deal for me as promised.

Dean

----- Forwarded Message -----



<u>PICOT v WESTON</u>, 5:12-CV-01939 EJD

# EXHIBIT "C"

**to**
**DECLARATION OF PAUL DAVID MANOS**
**IN OPPOSITION TO MOTIONS**
**TO DISMISS FOR**
**LACK OF JURISDICTION AND VENUE**
**AND TO TRANSFER**



From: "Bill Dobreff" <bd@dobrefflaw.com>
Date: Mar 20, 2012 9:28 AM
Subject: Dean Weston
To: <dmanos55@gmail.com>, <bpicot@dbhstech.com>
Cc: <deandavidweston@yahoo.com>

Gentlemen:

I am representing Dean Weston regarding your agreement to:

(a)     pay him $20,000 per month dating back to March of 2009 as a salary; and

(b)     to pay him one-third of all proceeds received and to be received from Hydrogen Master Rights Limited for the hydrogen cell technology, electrolyte formula and any other related assets;

or we will be filing suit against both of you. My client has a mutual cooperation agreement with Hydrogen Master Rights Limited with respect to their mutual claim and cases of action. My client has an extremely strong relationship with Hydrogen Master Rights Limited and has found what you had not disclosed to him. You can do the right thing and provide the rights and benefits of a one-third partner as agreed. Dean Weston would be able to serve as an intermediary and active participant to get this back on line and bring it to a successful completion. It would be in the best interest of all involved to resolved this fairly and as soon as possible. Please respond immediately.

William Dobreff
Dobreff & Dobreff, PC
44511 N. Gratiot Avenue
Clinton Township, MI 48036
(586) 838-3880
(586) 838-3884 fax